FILED

JAN 09 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. **4 : 2 3  CR 0 1 2** |
| v. | ) | |
| | ) | Title 21, United States Code, |
| JEFFREY SUTTON, | ) | Section 841(a)(1), (b)(1)(C), and |
| | ) | (b)(2); Title 18, United States |
| Defendant. | ) | Code, Section 1347 |

**JUDGE BOYKO**

## GENERAL ALLEGATIONS

At all times relevant to this Information unless otherwise specified:

### Defendant and His Medical Practice

1.      Defendant JEFFREY SUTTON was a medical doctor licensed by the State of Ohio Medical Board.

2.      Defendant owned and worked as the sole physician at his medical practice, Sutton Internal and Physical Medicine Clinic, located in or around Niles, Ohio.

3.      Persons who were patients of Defendant at his medical practice included Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 6, and Patient 7 (known to the First Assistant United States Attorney, but not named herein).

### Background Regarding Controlled Substance Prescribing

4.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.  With limited exceptions, the CSA made it "unlawful for any person knowingly or intentionally" to "distribute or dispense . . . a controlled substance" or conspire to do so.

5.      The term "controlled substance" meant a drug or other substance included in Schedules I, II, III, IV, and V of the CSA.  The term "dispense" meant to deliver a controlled substance by, or pursuant to the lawful order of, a practitioner.  It also included the prescribing and administering of a controlled substance.  The term "distribute" meant to deliver (other than by administrating or dispensing) a controlled substance.  The term "practitioner" meant a physician, medical doctor, dentist, or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he or she practiced, to distribute or dispense a controlled substance in the course of professional practice.

6.      Individual practitioners who wanted to distribute or dispense controlled substances in the course of professional practice were required to register with the Attorney General of the United States before they were legally authorized to do so.  Such individual practitioners were assigned a registration number by the United States Drug Enforcement Administration ("DEA").

7.      Practitioners registered with the Attorney General were authorized under the CSA to write prescriptions for, or to otherwise dispense, Schedule II, III, IV, and V controlled substances, so long as they complied with the requirements of their registrations.  21 U.S.C. § 822(b).

8.      As a medical doctor licensed in Ohio, Defendant was a "practitioner" within the meaning of the CSA.  Defendant was also registered to prescribe controlled substances under a unique DEA registration number.

9.      For medical doctors, compliance with the terms of their registrations meant that they could issue a prescription for a controlled substance to a patient only if the prescription was

"issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice." 21 C.F.R. § 1306.04(a).

10. The scheduling of controlled substances was based on each substance's potential for abuse, among other considerations. Drugs that had a high potential for abuse and could lead to severe psychological or physical dependence were classified as Schedule II controlled substances. Drugs that had a lower potential for abuse and could lead to limited physical or psychological dependence were classified as Schedule IV controlled substances. 21 U.S.C. § 812.

11. Oxycodone, hydrocodone, morphine, and methadone belonged to the opiate analgesic class of drugs used to treat moderate to severe pain. These drugs were commonly called opioids and were listed as Schedule II controlled substances with a high risk of addiction and abuse. Oxycodone was sold under the brand names OxyContin, Oxy-IR, and Roxicodone. Oxycodone was combined with acetaminophen and sold under the brand name Percocet. Hydrocodone was combined with acetaminophen and sold under the brand name Norco.

12. Diazepam, alprazolam, and clonazepam belonged to a class of drugs called benzodiazepines and were listed as Schedule IV controlled substances. These drugs were used to treat anxiety, seizures, and insomnia. They were sold under brand names Valium, Xanax, and Klonopin.

13. Methadone is a synthetic opioid that can be prescribed for pain reduction or for use in medication-assisted treatment (MAT) for opioid use disorder. For MAT, methadone is used under direct supervision of a healthcare provider.

14. Prescription drugs, such as those containing the opioids hydrocodone, oxycodone, or methadone or the benzodiazepines alprazolam, diazepam, or clonazepam, could be sold on the illegal secondary market, such as at the street level, for significant sums of money.

15. Controlled substances prescribed in certain dangerous combinations often produced dire effects on patients. In 2016, the United States Centers for Disease Control and Prevention ("CDC") recommended that physicians avoid prescribing opioids and benzodiazepines in combination—such as oxycodone, hydrocodone, or morphine with diazepam, alprazolam, or clonazepam—whenever possible. Together, the drugs caused severe respiratory depression, including leading to death.

16. The strength or dose of opioid controlled substances was often measured through Morphine Milligram Equivalents ("MME," sometimes also referred to as morphine equivalents or "MEQ"). The MME measurement first converted various opioid class drugs to morphine milligram equivalents based on a conversion factor of the strength of the opioid (using Morphine as a base of 1). The MME per day, referred to as the Morphine Equivalent Dose ("MED"), measured a patient's daily dosage of opioids based on the MME conversion for each controlled substance and the quantity of the controlled substance or substances prescribed per day. The MED measurement allowed for a relative comparison of patients' cumulative intake of opioid class drugs over 24 hours, based on the type and quantity prescribed. The CDC have medically determined the relative strength of opioids and made the list publicly available. CDC guidance issued in 2016 set a prescribing threshold of 90 MED for a patient at a given time, and instructed that clinicians should establish incremental benefits to pain and function to justify an increase to 90 MED or greater, due, in part, to increasing risk of patient overdose.

17.     Over 30% of opioid overdoses involved benzodiazepine use.  On August 31, 2016, the United States Food and Drug Administration ("FDA") issued a "black box" warning for prescribing opioids in combination with benzodiazepines.  The warning stated in part:

> FDA is warning patients and their caregivers about the serious risks of taking opioids along with benzodiazepines or other central nervous system (CNS) depressant medicines, including alcohol. Serious risks include unusual dizziness or lightheadedness, extreme sleepiness, slowed or difficult breathing, coma, and death.  These risks result because both opioids and benzodiazepines impact the CNS, which controls most of the functions of the brain and body.

18.     To ensure that they were issuing prescriptions for a legitimate medical purpose in the usual course of their professional practice, physicians often monitored patients' use of prescribed and non-prescribed substances by requiring patients to whom they prescribed opioids to submit urine samples for laboratory analysis.  Such a urine drug screen ("UDS") tested for the presence of non-prescribed controlled substances, which could negatively interact with prescribed controlled substances to cause injury to, or death of, patients.  A UDS also tested for the presence or absence of the controlled substances that the physicians were prescribing to their patients.  When a UDS failed to detect the presence of a prescribed drug, it suggested that the patient was not taking the drug as directed in the prescription.  Results indicating the absence of a prescribed substance suggested that the patient was abusing the drug by taking it too frequently and in greater amounts than prescribed, or that the patient was diverting the drug by selling it for profit on the illegal secondary market.

## Background Regarding Healthcare Benefit Programs

19.     Medicaid was a federal health care benefit program designated to provide medical services to certain individuals and families with low income as outlined in the Social Security Act (Title 42, United States Code, Section 1396 et seq.).  Medicaid was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347.

20. While the Federal Government funded large portions of Medicaid, the program itself was largely administered by the states. The Ohio Department of Medicaid ("ODM") administered Medicaid in Ohio, and it received historically approximately 60% of its funds from federal sources. Ohio providers claimed Medicaid reimbursement from ODM pursuant to written provider agreements. ODM received, processed, and paid those claims according to Medicaid rules, regulations, and procedures.

21. A Medicaid Managed Care Organization ("Medicaid MCO") was a private managed care organization that contracted with ODM pursuant to Ohio Revised Code Section 5164.85 to provide Medicaid services. Medicaid MCOs were health care benefit programs within the meaning of Title 18, United States Code, Sections 24(b) and 1347.

22. MCO 1 and MCO 2 were Medicaid MCOs operating in Ohio.

23. Medicare provided medical insurance benefits to any person age 65 or older, to certain disabled persons, and certain others. Medicare was a health care benefit program within the meaning of Title 18, United States Code, Sections 24(b) and 1347. Medicare Part B helped cover physician services, outpatient care, and supplies, when they were ordered by a doctor and medically necessary.

24. Private health insurers ("private insurers"), including Insurer 1 and Insurer 2, were also healthcare benefit programs under Title 18, United States Code, Sections 24(b) and 1347.

25. Medicare, Medicaid, Medicaid MCOs, and private insurers prohibited payment for items and services that were not "reasonable and necessary" to diagnose and treat an illness or injury and required providers to certify that services were medically necessary. Only claims that were medically necessary were entitled to reimbursement. Medicare claim forms, for

example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient." Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only paid for services that were actually performed by qualified individuals, were medically necessary, and were provided in accordance with federal and state laws, rules and regulations.

26.     Medicare, Medicaid, Medicaid MCOs, and private insurers provided prescription drug coverage for many of their members, paying for some or all of the cost of drugs that physicians prescribed for their members, but only if those prescriptions were medically necessary. Controlled substance prescriptions that were written outside the usual course of medical practice and not for a legitimate medical purpose were medically unnecessary and ineligible for payment.

Defendant's Illegal Prescribing Practices and Distribution of Controlled Substances

27.     From in or around January 2015 through in or around January 2022, Defendant knowingly prescribed medically unnecessary controlled substances, and knowingly did so outside the usual course of professional practice and not for a legitimate medical purpose, and caused health care benefit programs to be billed for both office visits that resulted in the prescriptions and the cost of the controlled substances themselves, and in doing so engaged in the following conduct:

        a.     prescribing opioid medications to patients for extended periods of time, including for more than a decade, with little change in regimen and despite knowing that opioid therapy had failed;

        b.     prescribing short-acting opioid therapy medications to patients for extended periods of time without establishing functional treatment goals and without establishing evidence-based, objective diagnoses for patient's pain, relying only on patients' vague and

subjective claims of pain, including when physical examinations were normal and either no medical imaging was ordered or medical imaging showed no abnormal results that could justify short-acting opioid therapy;

      c.     escalating the effective total daily dosage of opioid analgesics to extreme levels, including in combination with prescribing benzodiazepines;

      d.     prescribing patients high quantities of both methadone 10mg and oxycodone 30mg, and other combinations of different opioid medications, including in combination with prescribing benzodiazepines;

      e.     prescribing opioid medications to patients for extended periods of time despite recognized mental illness diagnoses and concerns that contraindicated treatment with long-term opioid therapy due the tendency for narcotics, among other issues, to exacerbate depression and anxiety, to worsen insomnia, and to induce panic attacks;

      f.     ignoring and choosing not to act on documented observations of behaviors that indicated patients were abusing or diverting prescribed controlled substances or abusing non-prescribed controlled substances, which Defendant recognized in a "Pain Management Agreement" that Defendant required patients to sign, acknowledging that "if I break this agreement, [Defendant] will stop prescribing . . . pain control medications for me," including the following agreements, violations of which Defendant routinely ignored without stopping or modifying opioid prescribing:

           i.     "I will NOT use any illegal controlled substance, including marijuana, cocaine, etc.";

           ii.     "I will NOT share, sell, or trade my medication with anyone"

        iii.     "I will NOT use any medication prescribed or given to another individual or left-over medication from another physician";

        iv.     "I agree to use" one specified pharmacy "to fill ALL my prescriptions";

        v.     "I agree that I will use my medication at a rate no greater than the prescribed rate"; and

        vi.     "I will bring all unused pain medication to EVERY office visit in the original RX bottle even if I have zero remaining";

        g.     ignoring and choosing not to act on documented failed UDSs despite knowledge that these failed UDSs indicated abuse or diversion of prescribed substances or abuse of non-prescribed substances (such as cocaine, fentanyl, and prescription opioids);

        h.     ignoring and choosing not to act on warnings provided by prescription drug management organizations, insurance carriers, and state authorities regarding high prescribing trends and danger to patients;

        i.     ignoring and choosing not to act on patients' requests to lower their dosages;

        j.     ignoring and choosing not to act on multiple failed pill counts indicating patients were not taking prescribed medication on the prescribed schedule; and

        k.     prescribing controlled substances in support of ongoing addiction rather than the legitimate treatment of chronic pain.

28.     Defendant engaged in sex acts with patients, including Patient 1, Patient 6, and Patient 7, including during office visits and outside of office visits.

29.     From time to time, Defendant directly distributed controlled substances to patients with whom he had sexual relationships outside of office visits, without a valid prescription and outside the course of his treatment of the patient, including Patient 6.

Defendant's Illegal Prescribing to Patients 1 through 5

30.     Defendant prescribed controlled substances, including opioids and benzodiazepines, to Patient 1 outside the usual course of professional practice and not for a legitimate medical purpose.  Defendant knew that his prescribing was outside the usual course of professional practice and not for a legitimate medical purpose, including for the following reasons:

a.      Patient 1 initially presented in or around August 2018 with complaints of "low back and right hip pain" that was already effectively managed with a muscle relaxer, and Defendant prescribed Percocet at the first visit despite documenting that Patient 1 had "no focal deficits" and a normal physical examination, and despite neither performing nor ordering any additional imaging or other testing.

b.      Defendant escalated Patient 1's opioid prescribing from 15 MED at the first visit to 225 MED, and combined the high-dose opioids with benzodiazepines despite the known risks, as well as with stimulants, a combination that is also known to be more addictive and increase the risk of overdose and death.

c.      Defendant maintained Patient 1's opioid prescribing at high levels despite a lack of any material improvement in Patient 1's subjective pain score reports, her function (which Defendant did not monitor), or her quality of life.

d.      Defendant maintained Patient 1's opioid prescribing at high levels despite being confronted with evidence of drug abuse, including the following:

i.      failed UDSs showing the presence of THC and non-prescribed buprenorphine (a drug that can be properly used for treating opioid addiction but is often illegally purchased by individuals addicted to opioids to control opioid withdrawal symptoms) and the absence of prescribed oxycodone and benzodiazepine; and

ii.      behaviors inconsistent with taking medications for legitimate medical treatment and in compliance with legitimate physician instructions, such as pharmacy shopping and taking more of a prescription than authorized.

e.      Defendant undertook the above prescribing to Patient 1 while engaging in a sexual relationship with Patient 1.

31.    Defendant prescribed controlled substances, including opioids and benzodiazepines, to Patient 2 outside the usual course of professional practice and not for a legitimate medical purpose.  Defendant knew that his prescribing was outside the usual course of professional practice and not for a legitimate medical purpose, including for the following reasons:

a.      Patient 2 initially presented in or around 2008 as a new patient with a pre-existing opioid prescription at approximately 45 MED, but failed a UDS as negative for prescribed oxycodone.

b.      After Patient 2's first visit, Defendant resumed prescribing opioids and escalated Patient 2's opioid prescribing to approximately 495 MED on a consistent basis, and combined the high-dose opioids with benzodiazepines despite the known risks.

c.      Defendant relied on subjective and vague pain complaints from "diffuse joint pain," joint stiffness, back pain, and pain related to rheumatoid arthritis, without attempting non-pharmaceutical treatments or any referral for rheumatoid consult, despite knowing that

opioids are not recommended for treatment of arthritis pain, and despite documenting no deficits in physical examinations and neither performing nor ordering any imaging.

        d.     Defendant maintained Patient 2's opioid prescribing at high levels despite a lack of any material improvement in Patient 2's subjective pain score reports, her function (which Defendant did not monitor), or her quality of life.

        e.     Defendant maintained Patient 2's opioid prescribing at high levels despite being confronted with evidence of drug abuse, including the following:

        i.     failed UDSs showing the absence of prescribed benzodiazepines (alprazolam);

        ii.     dozens of instances of failed pill counts or refusals to comply with pill counts for her benzodiazepine prescription (alprazolam);

        iii.     behaviors inconsistent with taking medications for legitimate medical treatment and in compliance with legitimate physician instructions, such as pharmacy shopping; and

        iv.     documenting that Patient 2's "pain complaints do not match her behavior."

    32.     Defendant prescribed controlled substances, including opioids and benzodiazepines, to Patient 3 outside the usual course of professional practice and not for a legitimate medical purpose.  Defendant knew that his prescribing was outside the usual course of professional practice and not for a legitimate medical purpose, including for the following reasons:

        a.     Patient 3 initially presented in or around 2007 as a new patient with pre-existing opioid and benzodiazepine prescriptions, with warnings from her prior provider that she

"will always complain that she is currently not getting enough pain medication," and with Defendant documenting records from the prior provider as demonstrating "a history of narcotic seeking" and noting that she lied about receiving narcotics from her prior provider.

   b.  Defendant relied on subjective and vague pain complaints from low back pain and "all over body pain," and a diagnosis of myelopathy (a disorder that results from severe compression of the spinal cord) that lacked any objective support, despite x-rays demonstrating normal condition and a physical examination that revealed no significant findings except an increase in spine curvature.

   c.  Defendant escalated Patient 3's opioid prescribing to outlier, extreme levels, to more than 2,000 MED for extended periods, and combined the high-dose opioids with benzodiazepines despite the known risks, and even maintained Patient 3's opioid prescribing level at greater than 2,000 MED without changing the level of benzodiazepines after a 2018 hospitalization for complications from Patient 3's use of benzodiazepines, when Patient 3 weighed approximately 80 pounds.

   d.  Defendant maintained Patient 3's opioid prescribing at high levels, in combination with benzodiazepines, despite recognizing and documenting Patient 3's diagnoses of depression, anxiety, paranoid schizophrenia, and obsessive-compulsive disorder, despite recognizing and documenting repeated instances of non-compliance with treatment for psychiatric conditions, and despite the known contraindications of long-term opioid use for patients with these mental illnesses.

   e.  Defendant maintained Patient 3's opioid prescribing at high levels, in combination with benzodiazepines, despite recognizing and documenting Patient 3's history of

substance abuse and diversion, and despite being confronted with evidence of drug abuse and addiction and treatment non-compliance, including the following:

      i.      two opioid-related hospitalizations, including for overdose;

      ii.      more than 20 failed UDSs showing the presence of non-prescribed controlled substances, including street drugs (such as cocaine), and the absence of prescribed substances;

      iii.      admitting to use of non-prescribed oxycodone;

      iv.      documented "excessive use" of medications, including "all medications" or specific medications such as "Xanax, methadone";

      v.      calling the office and demanding specific prescriptions from staff; and

      vi.      repeatedly requesting early medication refills.

33.      Defendant prescribed controlled substances, including opioids and benzodiazepines, to Patient 4 outside the usual course of professional practice and not for a legitimate medical purpose. Defendant knew that his prescribing was outside the usual course of professional practice and not for a legitimate medical purpose, including for the following reasons:

      a.      Patient 4 initially presented in or around November 2010 with complaints of "low back pain" and "pain which limits activity" but could not provide any explanation for how it was limited. Patient 4 had an inconsistent UDS on his first visit that was positive for opioids, but Defendant still prescribed opioid medication, and escalated Patient 4 from 30 MED to 365 MED.

14

b.    Defendant prescribed opioids to Patient 4 for approximately 10 years without evidence of improvement in pain or function, based on complaints of low back pain that were vague, subjective, and not supported by imaging or physical examinations.

c.    Defendant maintained Patient 4 at high doses of opioids despite Patient 4 showing evidence of drug abuse, addiction, and treatment non-compliance including the following, in violation of Patient 4's signed Pain Management Agreement, which Defendant documented as follows:

i.    seven instances of failed UDSs, showing both the absence of prescribed medications (methadone and oxycodone) as well as the presence of non-prescribed medications (hydrocodone and codeine) and street drugs (cocaine and fentanyl);

ii.    two instances of failure to submit to UDS;

iii.    25 instances of non-compliance with medications;

iv.    12 instances of non-compliance with attempted pill counts;

v.    pharmacy shopping through the use of multiple pharmacies despite agreeing to use a single specified pharmacy; and

vi.    seven instances of excessive use of all medications.

34.    Defendant prescribed controlled substances, including opioids and benzodiazepines, to Patient 5 outside the usual course of professional practice and not for a legitimate medical purpose.  Defendant knew that his prescribing was outside the usual course of professional practice and not for a legitimate medical purpose, including for the following reasons:

a.    Patient 5 initially presented to Defendant in July 2015 with a history of cocaine addiction, alcohol use, and failed prior opiate therapy with another physician, but

Defendant still prescribed Patient 5 high-dose opioids (660 MED) and benzodiazepines without establishing an objective pain diagnosis or conducting an independent medical evaluation, and continued despite Patient 5 failing a UDS on her visit.

        b.       In or around March 2019, Patient 5 was admitted to a local hospital for "altered mental state" and was diagnosed with substance abuse and addiction, with drug rehabilitation recommended and all opioids and benzodiazepine prescriptions halted and replaced with a buprenorphine addiction-treatment program.  Despite documenting these events, when Patient 5 returned to Defendant in or around April 2019, Defendant ceased buprenorphine and restarted Patient 5 on high-dose opioids (540 MED) and benzodiazepines, and then escalated the opioid prescriptions to 810 MED in or around May 2019.

        c.       Patient 5 appeared at the office on or about January 18, 2021, having received opioid prescriptions at an 810 MED level at a recent visit, and when told she did not have an appointment until the next Thursday, insisted, incorrectly, that the day was Thursday. Patient 5 appeared "very disoriented," "unstable in gait and balance," and "[was]n't making much sense while in the office."  Patient 5 reported having driven to the office and having rear-ended another vehicle on the way to the office.

        d.       Defendant maintained Patient 5's opioid prescribing at high levels, in combination with benzodiazepines, despite recognizing and documenting Patient 5's history of substance abuse and diversion, and despite being confronted with evidence of drug abuse and addiction and treatment non-compliance, including the following:

              i.       Patient 5 frequently presenting to the office with lethargy and confusion, having excessively used prescribed controlled substances, resulting in Defendant and

his staff documenting that she "can barely hold a conversation or keep her eyes open" and that she "seems to be confused and is slurring her speech";

      ii.      Defendant receiving at least five warnings from MCO 2 regarding excessive opioid prescribing to Patient 5;

      iii.      six instances of failed UDSs, including for the presence of alcohol in her system at the time of an office visit;

      iv.      11 instances of non-compliance with pill counts; and

      v.      25 instances of excessive use of medications.

## COUNTS 1 – 31
(Dispensing Controlled Substances, 21 U.S.C. § 841(a)(1), (b)(1)(C), and (b)(2))

The First Assistant United States Attorney charges:

35.    The factual allegations of paragraphs 1 through 34 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

36.    On or about the following dates, in the Northern District of Ohio, Eastern Division, Defendant JEFFREY SUTTON knowingly and intentionally dispensed the following Schedule II and Schedule IV controlled substances, by issuing a prescription for each controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, knowing that he was issuing each prescription outside the usual course of professional practice and not for a legitimate medical purpose, each prescription constituting a separate count of this Information:

| Count | Patient | Date Dispensed | Prescribed Substance | Schedule | Strength | Quantity |
|-------|---------|----------------|----------------------|----------|----------|----------|
| 1 | Patient 1 | 4/11/2019 | Oxycodone-Acetaminophen | II | 10mg/325mg | 105 |
| 2 | Patient 1 | 4/11/2019 | Alprazolam | IV | 1mg | 30 |

| Count | Patient | Date Dispensed | Prescribed Substance | Schedule | Strength | Quantity |
|-------|---------|----------------|----------------------|----------|----------|----------|
| 3 | Patient 1 | 7/16/2020 | Oxycodone HCL | II | 30mg | 120 |
| 4 | Patient 1 | 7/16/2020 | Clonazepam | IV | 1mg | 60 |
| 5 | Patient 1 | 7/16/2020 | Diazepam | IV | 2mg | 30 |
| 6 | Patient 1 | 7/16/2020 | Oxycodone HCL | II | 15mg | 60 |
| 7 | Patient 1 | 8/13/2020 | Oxycodone HCL | II | 30mg | 120 |
| 8 | Patient 1 | 8/13/2020 | Oxycodone HCL | II | 15mg | 60 |
| 9 | Patient 2 | 1/2/2018 | Oxycontin (ER) | II | 40mg | 90 |
| 10 | Patient 2 | 1/2/2018 | Oxycodone HCL (IR) | II | 30mg | 150 |
| 11 | Patient 2 | 1/2/2018 | Oxycodone-Acetaminophen | II | 10mg/325mg | 180 |
| 12 | Patient 2 | 12/17/2020 | Oxycodone HCL (IR) | II | 30mg | 150 |
| 13 | Patient 2 | 12/17/2020 | Oxycodone-Acetaminophen | II | 10mg/325mg | 180 |
| 14 | Patient 3 | 6/14/2018 | Methadone HCL | II | 10mg | 360 |
| 15 | Patient 3 | 6/14/2018 | Morphine Sulfate (ER) | II | 200mg | 90 |
| 16 | Patient 3 | 6/14/2018 | Alprazolam | IV | 2mg | 120 |
| 17 | Patient 3 | 7/12/2018 | Methadone HCL | II | 10mg | 360 |
| 18 | Patient 3 | 7/12/2018 | Morphine Sulfate (ER) | II | 200mg | 90 |
| 19 | Patient 3 | 10/9/2018 | Alprazolam | IV | 2mg | 120 |
| 20 | Patient 3 | 10/9/2018 | Methadone HCL | II | 10mg | 360 |
| 21 | Patient 3 | 10/9/2018 | Morphine Sulfate (ER) | II | 200mg | 90 |

| Count | Patient | Date Dispensed | Prescribed Substance | Schedule | Strength | Quantity |
|-------|---------|----------------|----------------------|----------|----------|----------|
| 22 | Patient 3 | 11/13/2018 | Methadone HCL | II | 10mg | 360 |
| 23 | Patient 3 | 11/13/2018 | Morphine Sulfate (ER) | II | 200mg | 90 |
| 24 | Patient 4 | 5/23/2019 | Methadone HCL | II | 10mg | 180 |
| 25 | Patient 4 | 5/23/2019 | Oxycodone HCL (IR) | II | 30mg | 180 |
| 26 | Patient 4 | 3/5/2020 | Methadone HCL | II | 10mg | 180 |
| 27 | Patient 4 | 3/5/2020 | Oxycodone HCL (IR) | II | 30mg | 180 |
| 28 | Patient 5 | 3/7/2019 | Oxycodone HCL (IR) | II | 30mg | 180 |
| 29 | Patient 5 | 3/7/2019 | Hydrocodone-Acetaminophen | II | 10mg/325mg | 180 |
| 30 | Patient 5 | 5/16/2019 | Diazepam | IV | 10mg | 90 |
| 31 | Patient 5 | 5/16/2019 | Oxycodone HCL (IR) | II | 30mg | 270 |

All in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), and (b)(2).

<u>COUNT 32</u>
(Distribution of Controlled Substances, 21 U.S.C. § 841(a)(1) and (b)(1)(C))

The First Assistant United States Attorney further charges:

37.     The factual allegations of paragraphs 1 through 29  of this Information are re-alleged and incorporated by reference as though fully set forth herein.

38.     In or around 2020, in the Northern District of Ohio, Eastern Division, on multiple occasions, Defendant JEFFREY SUTTON knowingly and intentionally distributed, that is, delivered to Patient 6 at the home of Patient 6, a detectable amount of Oxycodone (in the form of approximately 75 tablets of Oxycodone-Acetaminophen 10mg/325mg (also known as Percocet)

19

and approximately 20 tablets Oxycodone IR 15mg), a Schedule II controlled substance, while

engaged in a sexual relationship with Patient 6 outside the course of his medical practice, and

without a valid prescription, and knowing that his distribution was unauthorized.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

COUNTS 33 – 52
(Health Care Fraud, 18 U.S.C. § 1347)

The First Assistant United States Attorney further charges:

39.     The factual allegations of paragraphs 1 through 34 of this Information are re-

alleged and incorporated by reference as though fully set forth herein.

40.     From in or around January 2015 through in or around January 2022, in the

Northern District of Ohio, Eastern Division, Defendant JEFFREY SUTTON did devise and

intend to devise a scheme and artifice to defraud federal health care benefit programs in

connection with the delivery of and payment for health care benefits, items, and services.

Purposes of the Scheme

41.     The purposes of the scheme included, but were not limited to, the following: for

Defendant to unlawfully enrich himself by (1) attracting and maintaining patients seeking

prescriptions for medically unnecessary controlled substances, and (2) obtaining reimbursement

for office visits from health care benefit programs for visits in which Defendant issued

prescriptions for medically unnecessary controlled substances.

Manner and Means of the Scheme

42.     The manner and means by which Defendant carried out the scheme included, but

were not limited to, the following:

a.      Defendant prescribed controlled substances—including high levels of

opioids combined with benzodiazepines—that were medically unnecessary and knowingly

20

issued the prescriptions outside the usual course of professional practice and not for a legitimate medical purpose, as described in paragraph 27 of this Information.

        b.    Defendant's prescriptions for medically unnecessary controlled substances caused prescription drug claims to be billed to health care benefit programs, which would not have been covered but for Defendant's fraudulent representation that the substances prescribed were medically necessary.

        c.    Defendant required patients to attend regular office visits in order to obtain medically unnecessary prescriptions, and Defendant submitted and caused to be submitted to health care benefit programs claims for payment for those medically unnecessary office visits, which would not have been covered but for Defendant's fraudulent representation that the office visits were medically necessary.

Execution of the Scheme

43.    On or about the dates listed below, in the Northern District of Ohio, Eastern Division, Defendant JEFFREY SUTTON knowingly and willfully executed and attempted to execute the above-described scheme and artifice to defraud health care benefit programs as defined in Title 18, United States Code, Section 24(b), that is, the following health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, that is, the following medically unnecessary prescribed controlled substances and the following medically unnecessary office visits that Defendant required for patients to obtain corresponding prescriptions, by issuing the following prescriptions and therefore causing the submission of the claims for reimbursement for those medically unnecessary prescribed controlled substances, and by submitting and causing the submission of claims for reimbursement for medically unnecessary office visits Defendant required for corresponding prescriptions, each submission constituting a separate count of this Information:

21

| Count | Patient | Service Date | Health Care Benefit Program | Claim For Office Visit or Prescribed Substance | Strength | Quantity |
|---|---|---|---|---|---|---|
| 33 | Patient 1 | 7/16/2020 | Insurer 1 | Office Visit | | |
| 34 | Patient 1 | 7/16/2020 | Insurer 1 | Clonazepam | 1mg | 60 |
| 35 | Patient 1 | 7/16/2020 | Insurer 1 | Diazepam | 2mg | 30 |
| 36 | Patient 1 | 7/16/2020 | Insurer 1 | Oxycodone HCL | 15mg | 60 |
| 37 | Patient 2 | 1/2/2018 | Insurer 1 | Office Visit | | |
| 38 | Patient 2 | 1/2/2018 | Medicare | Oxycontin (ER) | 40mg | 90 |
| 39 | Patient 2 | 1/2/2018 | Medicare | Oxycodone HCL (IR) | 30mg | 150 |
| 40 | Patient 2 | 1/2/2018 | Medicare | Oxycodone-Acetaminophen | 10mg/325mg | 180 |
| 41 | Patient 3 | 10/9/2018 | MCO 1 | Office Visit | | |
| 42 | Patient 3 | 10/9/2018 | Medicare | Alprazolam | 2mg | 120 |
| 43 | Patient 3 | 10/9/2018 | Medicare | Methadone HCL | 10mg | 360 |
| 44 | Patient 3 | 10/9/2018 | Medicare | Morphine Sulfate (ER) | 200mg | 90 |
| 45 | Patient 4 | 5/23/2019 | Insurer 2 | Office Visit | | |
| 46 | Patient 4 | 5/23/2019 | Insurer 2 | Methadone HCL | 10mg | 180 |
| 47 | Patient 4 | 5/23/2019 | Insurer 2 | Oxycodone HCL (IR) | 30mg | 180 |
| 48 | Patient 5 | 5/16/2019 | MCO 2 | Office Visit | | |
| 49 | Patient 5 | 5/16/2019 | MCO 2 | Diazepam | 10mg | 90 |
| 50 | Patient 5 | 5/16/2019 | MCO 2 | Oxycodone HCL (IR) | 30mg | 270 |
| 51 | Patient 7 | 7/9/2015 | Medicare | Office Visit | | |

| Count | Patient | Service Date | Health Care Benefit Program | Claim For Office Visit or Prescribed Substance | Strength | Quantity |
|-------|---------|--------------|------------------------------|------------------------------------------------|----------|----------|
| **52** | Patient 7 | 7/9/2015 | Medicare | Oxycodone-Acetaminophen | 10mg/325mg | 180 |

All in violation of Title 18, United States Code, Section 1347.

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: *Michael L. Collyer*

MICHAEL L. COLLYER
Chief, White Collar Crime Unit